## AMERICAN NATIONAL BANK OF ST. JOSEPH v. UNITED STATES.

### No. 5356.

United States District Court
W. D. Missouri, W. D.
June 30, 1950.

Albert F. Hillix, Philip J. Erbacher, Kansas City, Mo., for plaintiff.

Sam M. Wear, United States District Attorney, Kansas City, Mo., for defendant.

DUNCAN, District Judge.

This action arises under the Internal Revenue Laws of the United States, Section 41(20) [now § 1346] of Title 28 United States. Code Annotated to recover for loss arising out of plaintiff's stock ownership in the Braddyville State Bank, Braddyville, Iowa, for which it took credit in its 1944 income tax return, and which was later disallowed by the Commissioner of Internal Revenue.

The case was submitted to the court upon stipulation of facts and evidence respecting the question of whether or not the assets over which the claim arose, had a determinable market value at the time they were received by the taxpayer. The "Stipulation of Facts" are:

"It is hereby stipulated and agreed by and between the parties hereto, by their respective counsel, that the following facts

are true and together with all the exhibits annexed hereto and incorporated herein as a part thereof, individually marked for identification, shall be received in evidence and may be found as facts by the District Court of the United States for the Western Division of the Western District of Missouri, subject to the right of either party to enter objections upon the grounds of immateriality and/or irrelevancy and subject to the further right of either party to introduce additional and further evidence or other facts not inconsistent herewith:

"1. This action arises under the internal revenue laws of the United States and is brought by American National Bank of St. Joseph against the United States in accordance with Section 41(20) of Title 28, United States Code, to recover in the aggregate the sum for $4,000.83, plus statutory interest, arising out of a claimed long-term capital loss disallowed by the Commissioner, or, in the alternative, the aggregate of $7,747.84, plus statutory interest, arising out of a claimed bad debt disallowed by the Commissioner.

"2. The taxes in controversy represent a portion of the total corporation income taxes paid for the calendar years 1944 and 1945. The portions sought to be recovered consist of $1,256.50, plus $152.71 interest paid thereon, and $2,558.21, plus $33.41 interest paid thereon, or, in the alternative, as stated in paragraph 1, supra.

"3. The American National Bank of St. Joseph, hereinafter referred to as the taxpayer, is a corporation and a National Banking Association duly organized and existing under the laws of the United States relating to national banks with its banking house and place of business located in St. Joseph, Buchanan County, Missouri. The taxpayer has full power and authority to maintain this action.

"4. Dan M. Nee, the former Collector of Internal Revenue, to whom the taxes and interest described below in this stipulation were paid, is no longer and was not at the time of filing this action the duly qualified and acting Collector of Internal Revenue for the Treasury Department of the Government of the United States of America, for and in the Sixth District of Missouri at Kansas City, Missouri.

"5. On or before March 15, 1945, the taxpayer filed with the Collector of Internal Revenue in and for the Sixth District of Missouri, Kansas City, Missouri, on Form 1120, its corporate income tax return for the calendar year ending December 31, 1944, copy of which is attached hereto marked Exhibit A. On or before March 15, 1946, the taxpayer filed with the Collector of Internal Revenue in and for the Sixth District of Missouri, Kansas City, Missouri, on Form 1120, its corporate income tax return for the calendar year ending December 31, 1945, copy of which is attached hereto marked Exhibit B.

"6. Taxpayer's 1944 income tax return, as filed, showed in detail normal tax net income of $40,218.07 and surtax net income of $61,348.94. Taxpayer included in said return short-term capital gains of $288.06 and long-term capital gains totaling $4,565.10 and deducted $14,229.74 as a bad debt due from one E. T. Schmidt. Total income tax due from taxpayer was shown on the return as $17,779.11.

"7. By letter of February 21, 1947, from the Bureau of Internal Revenue, taxpayer was advised of a proposed deficiency in corporation income tax of $7,205.48 for the year ended December 31, 1944. To arrive at the amount of this deficiency in tax the Commissioner of Internal Revenue proposed disallowance of deductions totaling $15,502.96. Of this amount $14,229.74 represented the deduction of $14,229.74 for a claimed bad debt loss on debt due from E. T. Schmidt. The Commissioner proposed a normal tax net income for the year ended December 31, 1944, of $55,721.03 and surtax net income of $76,851.90, including short-term capital gains of $288.06 and long-term capital gains of $4,565.10 and proposed to determine an income tax liability of taxpayer for the year 1944 of $24,984.59. Taxpayer paid the tax of $24,-984.59 in the following amounts at the following times:

March 15, 1945 — $5,240.00
June 9, 1945 — 4,211.20
September 4, 1945 — 6,345.60
December 6, 1945 — 1,982.31
April 17, 1947 — 7,205.48 plus $877.63 interest

Total                $24,984.59 plus $877.63 interest

"8. The claimed loss of $14,229.74, referred to as a bad debt loss by the taxpayer in its original return, arose in the following manner:

"One E. T. Schmidt borrowed from it the sum of $8,900 on a certain promissory note dated May 2, 1927. In order to secure said loan Schmidt deposited as collateral 132 shares of $100 par value stock of the Bradyville State Bank, Bradyville, Iowa, an Iowa corporation, hereinafter referred to as Bradyville. Outstanding capital stock of Bradyville consisted of 250 shares of $100 par value of common stock. On or about October 11, 1927, the taxpayer released Schmidt from liability on the unpaid $8,900 note and cancelled it in consideration of his transfer of the Bradyville stock to the taxpayer, the stock having a market value to the taxpayer of not less than $8,900.

"9. On or about November 12, 1927, taxpayer made a capital contribution to Bradyville in the amount of $6,600 in payment of a capital assessment of $50 per share. On or about February 5, 1935, as set forth in paragraph 10, infra, taxpayer made a further capital contribution to Bradyville in a form of payment of capital assessment of $6,600. The above transactions resulted in a combined cost or base to the taxpayer of $22,100 for the 132 shares of Bradyville.

"10. On or about December 1, 1933, Bradyville closed its doors and was taken over on or about December 1, 1933, by an examiner for the Iowa State Banking Department for liquidation. The examiner in charge of closed Bradyville requested in 1935 a capital assessment on shares of stock of Bradyville. Many of the minority stockholders were unable to pay. However, on February 5, 1935, the taxpayer paid its share of said capital assessment in the amount of $6,600, as stated in paragraph 9, supra.

At that time it was agreed that if at the time the assessments were paid in a stockholder surrendered his stock, then his further liability would cease, or, if the stock was retained the contributing stockholder would participate in future distributions. Not all stockholders paid their assessment but those who did retained their stock.

"11. The taxpayer's books and records (Exhibit D, page 7) show that on order of the bank examiner it had charged off its investment in the 132 shares of Bradyville as follows:

January 2, 1932, charged to undivided profits — $ 3,500
October 31, 1933,    "    "    "    "    —    4,000
May 24, 1934,        "    "    "    "    —    4,000
October 19, 1934,    "    "    "    "    —    4,000
June 6, 1935,        "    "    "    "    —    6,600

                              Total              $22,100

"12. During the receivership all credit liabilities of Bradyville were paid in full. After the depositors and other creditors had been thus finally paid off by the Iowa State Banking Department in 1935, the stockholders called a special meeting for November 12, 1935 'for the purpose of electing three Trustees from the list of stockholders to receipt the Banking Department for the remaining assets of the bank after the depositors were fully paid.'[1] At that meeting George U. Richmond, J. E. McCurdy and Ed Teuscher were elected as trustees by the stockholders. The details

I. See Note on following page.

I.
    "In the District Court of the State of Iowa in
                and for Page County

"D. W. Bates, Superintendent of
Banking of the State of Iowa.
                        Plaintiff,
                vs.                        Application for Order to
Braddyville State Bank,                    Dispose of Remaining Assets
Braddyville, Iowa.
                        Defendant

"Comes now D. W. Bates, the duly appointed, qualified and acting Receiver of the Braddyville State Bank of Braddyville, Iowa, and represents to this Court that he has heretofore, under Orders of this Court, paid three dividends on the net deposit claims allowed in this Receivership, which total 100% of the deposit claims as filed and allowed; that he has paid dividends of 100% on the net amount of general claims allowed in this Receivership; that he has paid all preferred claims allowed and has also paid all expenses of this Receivership except a few minor items recently accrued or that may accrue in the final closing of this Receivership.

"This Receiver further states that all creditors were given due and legal notice as prescribed by this Court relative to filing of their claims after the appointment of the Receiver; that his reports upon classification, allowance and rejection of claims was filed in due course and notice of hearing thereon given as prescribed by this Court and said report has been approved by the Court and there are no undetermined claims in this Receivership.

"That all claims having been paid in full the remaining assets in the Receivership together with the cash on hand, after expenses of final closing have been paid, should be turned over to the Stockholders or to proper Trustees designated by them which assets are to be liquidated and cash applied:

First.    To reimburse the stockholders who have paid their assessments.
Second.   The balance of the assets to be prorated to the Stockholders in proportion to the stock held by each. An assessment of 50% on the Capital Stock was levied and the Stockholders have paid on their assessment the amount set opposite their names as set out below:
          * * *

"That a meeting was held by the Stockholders on November 12, 1935, at which meeting a majority of the Stock was represented; that at said meeting the Stockholders elected J. E. McCurdy, Ed Teuscher, and Geo. U. Richmond as Trustees requesting that the remaining assets together with the cash on hand, after expense of final liquidation has been paid, be turned over to said Trustees for the purpose of liquidation and distribution. A copy of the minutes of the Stockholders meeting is attached hereto and marked Exhibit 'A'.

        "That attached hereto is a list of remaining assets, exclusive of cash, which are to be surrendered to said Trustees, marked Exhibit 'B'

Wherefore, your Receiver prays to the Court that an order be entered authorizing him to turn over, without recourse, all the remaining assets in his hands as set out in Exhibit 'B' including cash on hand after all expenses of administering the affairs of this Receivership have been fully paid including the books and records of the Braddyville State Bank, Braddyville, Iowa, to the Trustees designated by the Stockholders to act as *their* liquidating agents.

        "And the Receiver further prays that he be authorized to execute any and all assignments, deeds and other instruments necessary to properly transfer these remaining assets to the Trustees.

        "And the Receiver further prays that this Court enter an Order prescribing notice and fixing a time and place of hearing upon this application, and for such other and further orders in the premises as the Court may deem just and right.

                        (signed)        D. W. Bates
                                        Receiver

                        (signed).       R. G. Penniston
                                        Examiner in Charge"

(Affidavit omitted)

of the transactions referred to herein are
more fully set forth in Exhibit C, pages
11-13 (Application for Order to Dispose
of Remaining Assets), and page 15 (Special
Stockholders Meeting).[2]

2.
"Special Stockholders Meeting.

"Office of Braddyville State Bank, Braddyville, Iowa,
now in liquidation.

"This Stockholders meeting called by R. G. Penniston, Examiner in Charge, as
directed by the Directors, at a meeting on November 5th, 1935.

"Stockholders present, representing stock as follows:

"C. E. Apple    holding    5    shares of bank stock.
J. E. Fishel    holding    19.4    shares of bank stock.
R. A. Hawthorne "    4.4    "    "    "    "
J. E. McCurdy holding    22.4    "    "    "    "
W. M. Russell holding    5    "    "    "    "
C. D. Wort    "    9.4    "    "    "    "
H. I. Douthit    "    2    "    "    "    "
Vern Hamlin    "    5    "    "    "    "
O. B. Holton
(James)    "    2    "    "    "    "
H. E. Osborn holding    5    "    "    "    "
Geo. U. Richmond "    2    "    "    "    "
Ed. Teuscher holding    12.4    "    "    "    "
Geo. U. Richmond,
Pledgee for American
National Bank, St.
Joseph, Mo. holding    130    "    "    "    "
Total number of shares represented ..................... 224

"On motion made by Geo. U. Richmond and seconded by Dr. R.
A. Hawthorne, J. E. McCurdy was appointed Chairman of this
meeting, and R. G. Penniston as Secretary.

"This meeting was called for the purpose of electing three Trustees From the
list of Stockholders, to receipt the Banking Department for the remaining assets
of the bank after the Depositors are fully paid.

"Informal ballot was cast to place in nomination names for the Trustees, and
the results of such ballot was as follows:

J. E. McCurdy    200.4 shares    H. E. Osborne    73.4 shares
Ed. Tuescher    202.4    "    Geo. U. Richmond    198.8
J. E. Fishel    2.    "

"Moved by H. E. Osborne and seconded by H. I. Douthit, that the three named
receiving the majority of votes, J. E. McCurdy, Ed. Teuscher, and Geo. U. Rich-
mond be voted the unanimous vote and be elected the three Trustees.

"Motion carried, all voting Yes.

"Motion by C. E. Apple, Seconded by Vern Hamlin, as follows * —
That the Turstees elected are hereby authorized to use their best efforts in the
liquidation of the assets, turned to them, by the Banking Department, that they
are empowered to employ such legal talent as they deem best, also competent
office help as they may need, paying for such from the funds in their possession,
that they shall not be required to furnish bond, but they will be responsible to
the Stockholders, for the assets, if entrusted to some one else for collection, or
handling for them.

"Motion carried, all voting Yea.

"After a general discussion of the affairs and conditions, generally in which the
best of feeling prevailed, on motion of Geo. U. Richmond, which was seconded by
C. E. Apple, that we adjourn was carried. All voting Yea.

"Meeting Adjourned.

"R. G. Penniston                                                 J. E. McCurdy
Secretary.                                                               Chairman."
(Jurat omitted).

"13. On or about January 11, 1936, all of the remaining assets of Bradyville, remaining after full and final payment of claimants other than shareholders, were turned over to the said trustees, together with the books and records of Bradyville, by order of the District Court of Page County, Iowa. This order[3] appears on pages 21 and 22 of Exhibit C.

"14. Bradyville was declared dissolved by court order on April 8, 1936, and its charter officially cancelled by the State of Iowa on that date. Copy of said court order is attached hereto and made a part hereof appearing on page 23 of Exhibit

3.                    "In the District Court of the State of Iowa
                                  in and for Page County.

"D. W. Bates, Superintendent of
Banking of the State of Iowa.
                              Plaintiff                    Order
                vs.                              Authorized the Receiver to
Braddyville State Bank,                          Make Final Disposition of
Braddyville, Iowa.                               Remaining Assets.
                              Defendant

"Now on the *11th* day of January, 1936, comes on for hearing the application of D. W. Bates, Receiver of the Braddyville State Bank of Braddyville, Iowa, for an order authorizing him to turn over all the assets remaining, including cash on hand after all expenses of the Receivership are paid, to the Trustees designated by the Stockholders of the Braddyville State Bank of Braddyville, Iowa. The Court having duly examined the application and record herein finds that the Receiver has satisfied in full all claims properly allowed in this Receivership and that all the assets now remaining in the *Receiver's* hands including cash, after all accruing expense of Receivership has been paid, are the property of the Stockholders of record upon the date of the closing of this Receivership, and that it is for the best interests of this Receivership that the Receiver's Application be granted as prayed.

"It is Therefore Ordered, Adjudged and Decreed as follows:

"1. That D. W. Bates, Receiver be authorized to assign and deliver, without recourse, to J. E. McCurdy, Ed Teuscher, and Geo. U. Richmond, Trustees, all remaining assets in his hands as set out in Exhibit 'B' together with all cash on hand after all expenses of this Receivership are paid.

"2. That said Receiver is authorized to pay all necessary expenses in connection with bringing this Receivership to a close out of the cash on hand.

"3. That said Receiver is authorized to deliver to said Trustee all the books and records of the Braddyville State Bank, of Braddyville, Iowa in his possession.

"4. That said J. E. McCurdy, Ed. Teuscher and Geo. U. Richmond as Trustees shall receipt for the remaining assets and proceed to liquidate them and the cash realized shall be applied as follows:

"FIRST: They are to reimburse the Stockholders who have paid their stock assessment as shown in application.

"SECOND: The balance to be pro-rated to the Stockholders in proportion to the stock held by each on date of closing of this Receivership.

"5. That said Receiver is authorized to execute all instruments necessary to make a proper conveyance of these assets, such as assignments, Receiver's Deeds and other instruments necessary to transfer these remaining assets to the Trustees.

                              (signed)      Earl Peters
                                            ─────────────
                                               Judge"

C.[4] Copy of the official records of the Secretary of State showing action taken by the State of Iowa is attached hereto and made a part hereof marked Exhibit E.

"15. Assets transferred to the trustees in 1936 consisted of the following items with face values as indicated:

Cash on Hand $ 2,007.16
Notes Receivable 30,021.97
1 eight foot bookkeepers desk
1 Burroughs Electric Posting Machine
Miscellaneous personal property 2,073.50
Non-ledger assets (notes) 6,142.19
Ctf. in Clarinda National Bank, Clarinda, Iowa 6,896.16 (Worthless)
Miscellaneous 15.00

These assets had a substantial value.

"16. Debts against these assets of Bradyville at the time of transfer to the trustees on January 11, 1936, were zero.

"17. The assets described above were reduced to cash by the trustees over a period of years beginning 1936 and ending in 1944.

"(a) From the period 1936 to 1939 the trustees realized cash from these assets which cash, less expenses, was distributed to shareholders, the taxpayer receiving as its pro rata share the amounts set out in paragraph 18, infra.

"(b) On April 18, 1936, Mr. R. G. Penniston, who had been acting in his official capacity as state examiner in charge of closed Bradyville, was released and discharged from his official duties by court order and thereafter he was employed by the trustees in a private capacity, serving until the end of 1939, during which time he made collections, kept the records, rendered periodic financial statements to the trustees

4. "In the District Court of the State of Iowa in and for Page County

"D. W. Bates, Superintendent of Banking of the State of Iowa,
                    Plaintiff,
        vs
The Braddyville State Bank, Braddyville, Iowa
                    Defendant.

Order Approving Receiver's Final Report

"Now on this 18 day of April, 1936 the above entitled matter coming on to be heard upon the application of D. W. Bates, Receiver of the Braddyville State Bank, Braddyville, Iowa, asking that the Court make and enter an Order approving the Receiver's Final Report, together with all the acts and doings of the Receiver thereunder, the discharge and release of D. W. Bates as Receiver and R. G. Penniston as Examiner in Charge and the dissolution of the corporation. The Court, being fully advised in the premises therein and having inspected the proofs of the publication of the notice as prescribed by the Court, finds that such an Order should be made and entered.

"Wherefore, it is Hereby Ordered and Directed as Follows:

"1. That said Receiver's Final Report be and the same hereby is approved together with all expenditures and disbursements as shown therein.

"2. That the Receiver be and he is hereby authorized to deposit with the Clerk of this Court all funds of said Receivership which cannot be delivered to any person or persons whose places of residence or whereabouts are unknown to said Receiver.

"3. That said D. W. Bates, Receiver, and R. G. Penniston, Examiner in Charge, respectively, be discharged and released from all liability therewith and their bondsmen exonerated.

"4. That the corporation known as the Braddyville State Bank, Braddyville Iowa, is hereby dissolved.

(signed)     Earl Peters
                  Judge"

and made cash distributions to the various stockholders.

"(c) In the latter part of 1939 Penniston discontinued his services and turned over all records to George U. Richmond, one of the trustees. Richmond, who maintained the records until the termination of the trust in late December, 1944, kept no minutes of trustees meetings nor recorded or posted any transactions in the books and records of Bradyville. From 1940 to 1944 the trustees by letters and personal calls contacted the debtors and suits were filed during said period in an effort to make collection. The last principal collection was in May, 1944, in the amount of $650, less expenses of $85.81, or $564.19 net. All remaining assets, consisting of bills receivable amounting to $11,267.04, were sold at public sale on December 18, 1944, for the sum of $5. Thereafter a final distribution was made to shareholders on December 27, 1944, and taxpayer received as final distribution from the trustees the sum of $739.20 on that date. The trust ceased to exist on December 27, 1944. Pertinent schedules, court orders and other exhibits covering the time from the date of the receivership up to the disposition of the remaining assets of Bradyville by the receiver are attached hereto and made a part hereof, individually marked for identification, and are to be received in evidence as Exhibit C. Pertinent schedules covering the period of the existence of the trust, viz., January 1, 1936, to December 27, 1944, are attached hereto and made a part hereof, individually marked for identification, and are to be received in evidence as Exhibit D.

"18. During the years 1940 to 1944 in addition to the other activities of the Trustees mentioned in this stipulation, collections were made as follows:

| | | |
|---|---|---|
| 1940 | — | $ –0– |
| 1941 | — | 603.00 |
| 1942 | — | –0– |
| 1943 | — | 143.40 |
| 1944 | — | 564.19 |

"19. During the years 1940 to 1944 suits were filed and legal actions disposed of by the Trustees as follows:

"1. 1940—Trustees filed claim in bankruptcy court in matter of Merrill D. Cox, bankrupt, Burlington Junction, Iowa. Received $200.00 on February 28, 1941 in payment.

"2. 1941—Obtained scire facias to revive judgment obtained in 1937 against James A. Cox for $601.00 plus interest and attorney fees.

"3. 1941—Trustees filed suit against Ray Bebout and Namie Bebout, Nodaway County, Maryville, Missouri—$787.00.

"4. 1942—Suit by trustees against Albert A. Sunderman and Doris Sunderman —$3,481.36. Judgment rendered for said amount in January 28, 1943, said judgment being in rem against an undivided one-sixth interest of Albert A. Sunderman in and to certain real estate in Page County, Iowa.

"5. 1943—Settled judgment against T. W. Davison, Page County, Iowa, for $175.00.

"6. 1944—Sold all remaining assets at public auction as described above in this stipulation.

"20. Over the period 1936–1944 the taxpayer received payments representing its proportionate share of cash realized by the trustees from the assets, less expenses, in the following amounts and at the following times:

| | | |
|---|---|---|
| September 1, 1936 | — | $3,300.00 |
| May 26, 1937 | — | 1,650.00 |
| December 16, 1937 | — | 990.00 |
| January 7, 1939 | — | 660.00 |
| February 4, 1939 | — | 531.06 |
| December 27, 1944 | — | 739.20 |
| Total | — | $7,870.26 |

"21. On January 1, 1944, the assets in the hands of the trustees had a face value of $11,892.93 and the amount of final distribution to all stockholders in 1944 totaled $1,274.56.

"2. If it should be found by the Court that the loss claimed herein occurred in 1944, it is agreed that such loss to the taxpayer on the Braddyville stock was $14,229.74. (Basis $22,100 less cash realized on dissolution $7,870.26.) On the other hand, if it should be found by the Court that the loss herein occurred in a year prior

to 1944, then it is agreed that the taxpayer is not entitled to any recovery hereunder, unless the Court should find the loss to have occurred as a capital loss in 1942 or 1943. In the latter event the taxpayer contends that it would be entitled to a capital loss carry-over in 1944 resulting in a capital loss deduction in 1944 in the same amount as claimed by the taxpayer in refund claim filed, but the Government contends that such a carry-over is not within the scope of the issues raised in the claims for refund or under the pleadings.

"23. Taxpayer's 1945 income tax return, as filed attached hereto marked Exhibit E, showed in detail normal tax net income of $105,381.81, and surtax net income of $139,412.81. Taxpayer included in said return short-term capital gains of $765.63 and long-term capital gains of $57,384.98. Total income tax due from taxpayer was shown as $38,989.94. No deduction or loss was claimed relating to the Bradyville stock transaction.

"24. By letter of February 21, 1947, from the Bureau of Internal Revenue, taxpayer was advised of a proposed deficiency in corporation income tax of $540.54 for the year ended December 31, 1945. To arrive at the amount of this deficiency in tax the Commissioner of Internal Revenue proposed normal tax net income for 1945 of $106,733.15 and surtax net income of $140,764.15, including short-term capital gains of $843.75 and long-term capital gains of $57,384.98 and proposed to determine income tax liability of taxpayer for the year 1945 at $39,530.48. No capital loss carry-over from 1944 was included in the figures proposed by the Commissioner nor was any deduction allowed relating to the Bradyville stock transaction. The taxpayer paid tax of $39,530.48 in the following amounts and at the following times:

| | | |
|---|---|---|
| March 15, 1946 | — | $ 9,747.49 |
| June 15, 1946 | — | 9,747.49 |
| September 5, 1946 | — | 9,747.49 |
| December 6, 1946 | — | 9,747.49 |
| April 15, 1947 | — | 540.54 plus $33.41 interest |
| Total | — | $39,530.48 plus $33.41 interest |

"25. On November 10, 1947, taxpayer filed with the Collector of Internal Revenue for the Sixth District of Missouri, Kansas City, Missouri, claims for refund of taxes and interest paid, copies of which are attached to the complaint filed herein and are self-explanatory. The purport of this paragraph is limited to stipulating only the fact that refund claims were filed and is not to be construed as binding the United States in respect to the legal grounds upon which the claims rest.

"26. Taxpayer filed its income tax returns for the years in question on the cash basis.

"27. Copy of taxpayer's corporation income and excess profits tax return for 1939 is attached hereto and made a part hereof marked Exhibit F.

(signed: Sam M. Wear
United States Attorney
by David A. Thompson

of Facts" is:

(signed: Albert F. Hillix

(signed: Philip J. Erbacher
Counsel for Complainant"

The oral testimony consisted of two witnesses—Mr. George U. Richmond, vice-president of plaintiff bank, a director of the liquidated bank and one of the trustees. The other witness was Mr. C. J. Holt, an Internal Revenue agent attached to the Des Moines, Iowa office of the Omaha Division of the Bureau of Internal Revenue.

On behalf of the plaintiff, Mr. Richmond testified that when the assets were taken over by the trustees, practically all of the assets were notes of farmers; there were a few exceptions, such as typewriter, adding machines, a few minor fixtures, and of course, the $2000.00 in cash; that the assets had a potential value all during the period 1936 to 1944 and that the usual and customary efforts were made to collect such assets during that period, it being the belief of the trustees that they would continue to collect. Mr. Richmond further expressed the opinion that there was no market value for the assets at the time they were taken over by the trustees. He made this answer in regard thereto:

"A. Well, they had a potential value but we had no way of determining that value; whether there was a market value then, I couldn't say. I doubt very much whether there was any particular market value in them, but we felt there was a good potential value if worked through the years.

"Q. You felt there was no market value at that time?

"A. That is my opinion."

Mr. Richmond further based his belief upon the fact that during this period many banks were undergoing liquidation as a result of the 1933 closings, and that many notes of this type and character were in process of collection.

Mr. Holt testified on behalf of the defendant that he had a conversation with Mr. Richmond in the plaintiff bank at St. Joseph some time during the year 1949 during which he asked Mr. Richmond if they could have been sold, and he said "yes." He further stated that he asked him if they had a determinable market value at that time, and that Mr. Richmond replied "yes." That was all of the testimony offered on behalf of the defendant respecting the value of the assets.

Summarized and briefly stated, the facts agreed upon are:

(1) The plaintiff lent to E. F. Schmidt $8,900.00 on May 2, 1927 for which he executed his promissory note and deposited as security, 132 shares of stock of the Braddyville State Bank of the par value of $100.00 per share. On or about October 11, 1927 the plaintiff released the said Schmidt from liability on the unpaid note and cancelled it in consideration of his transfer of the stock aforesaid to the taxpayer. At that time the stock had a value of not less than $8,900.00.

On October 12, 1927 the plaintiff made a capital contribution to the Braddyville State Bank in the amount of $6,600.00 representing a capital assessment of $50.00 per share, and again on February 5, 1935 pursuant to a request by the liquidator of the bank for an additional assessment of $50.00 per share, the further sum of $6,600.00 was paid by the plaintiff.

(2) On December 1, 1933 the Braddyville State Bank was taken over by the Examiner for the Iowa State Banking Department for liquidation, and thereafter ceased to conduct any business.

(3) At the time of the payment of the last assessment, it was agreed by the stockholders and the liquidating authorities, that if the assessments were paid and the stock surrendered, further liability would cease, or if the stock were retained, the contributing stockholder would participate in future distributions. Not all of the stockholders paid their assessments, but those who did, retained their stock, and that included this plaintiff.

(4) Prior to the final distribution, the receiver paid all the claims against the bank, except those of the stockholders.

(5) Pursuant to notice, the stockholders elected three trustees to receive the assets after the payment of all other claims, costs and expense of the receiver, except the claims of the stockholders.

(6) The court ordered the receiver to turn over to the trustees, all such remaining assets, which the trustees receipted for and received without recourse, to be liquidated by such trustees and the proceeds thereof to be used to pay the stockholders' assessments, and thereafter to be distributed among the stockholders in accordance with the amount of stock held by them.

(7) Upon the delivery of such assets, the receiver was discharged and the corporation dissolved by order of the court, and the proper record was made in the office of the Secretary of State for the State of Iowa.

(8) From 1936 to 1944 the trustees were engaged in liquidating the assets and distributing the money among the stockholders, the last collection having been made and the last dividend paid in 1944. This dividend included $5.00 received for approximately $11,000.00 face value of assets sold at public auction.

(9) This final dividend brought the amount received by the plaintiff from the trustees from the liquidation of the assets to $7,870.26. This deducted from the $22,-

100.00—the original cost of the stock—resulted in a loss of $14,229.74. This amount was claimed as a deduction from the plaintiff's income tax for the year 1944.

The only question of fact which has not been agreed upon, and which must be determined by the court is that raised by the testimony, as to whether or not the assets had a determinable market value when received by the trustees. That question will be determined in connection with the issue raised by it.

Plaintiff contends first, that the liquidation or dissolution of the corporation, Braddyville State Bank, for the purposes of the Internal Revenue Laws, was not completed until December 1944 when the final liquidating dividend was paid by the trustees to the stockholders, and that its loss on the 132 shares of stock in the bank arose at that time, or, second, if the liquidation of the bank or dissolution of the corporation in fact and in law took place in 1936 upon the distribution of the assets of the corporate bank to the trustees, that such assets had no determinable market value as of that date, which necessitated the postponement of the realization of the loss until their final disposition in 1944.

Defendant contends that the loss occurred in 1936, when the assets were distributed to the trustees, or in some year prior to that of 1944, and that the burden is upon the plaintiff to show that it did occur in 1944.

In its brief, the plaintiff cites numerous Iowa authorities, and authorities from numerous other states, holding that the dissolution of a corporation does not necessarily destroy the right of the corporation to do whatever may be necessary toward its liquidation. Particularly does it rely upon the case of Grimes Savings Bank v. Jordan, 224 Iowa 28, 276 N.W. 71. In that case the court said, 276 N.W. loc. cit. 75: " * * * The corporation, though the receivership is dissolved must be regarded as existing to the degree necessary to permit it to discharge its obligations and fully wind up its affairs. (Citing: Wisconsin & Arkansas Lumber Company v. Cable, 159 Iowa 81, 140 N.W. 211.)"

For the purpose of determining this issue, I think it is not necessary for the court to pass on that question, because it is my conclusion that with the closing of the receivership and the dissolution of the corporation under the circumstances of this case, the affairs of the corporation were fully wound up.

The records show that after all the claims against the bank had been paid by the examiner in charge, or paid by the receiver, the receiver made application for an order to dispose of the remaining assets. These assets included mostly notes which apparently the receiver had been unable to collect, together with some other personal property and money, not needed for the payment of other claims, thus leaving the claims of the stockholders as the only claims against the bank.

In that application the receiver asked that the assets "be turned over to the Stockholders or to proper Trustees designated by them which assets are to be liquidated and cash applied;" In the prayer of the application it was stated:

"Wherefore, your Receiver prays to the Court that an order be entered authorizing him to turn over, without recourse, all the remaining assets in his hands as set out in Exhibit 'B' including cash on hand after all expenses of administering the affairs of this Receivership have been fully paid including the books and records of the Braddyville State Bank, Braddyville, Iowa, to the Trustees designated by the Stockholders to act as *their* liquidating agents."

The stockholders met and elected their trustees, and thereafter the court ordered the receiver to turn over the assets in accordance with the application, and the following language appears in the order of the court:

"The Court having duly examined the application and record herein finds that the Receiver has satisfied in full all claims properly allowed in this Receivership and that all the assets now remaining in the Receiver's hands including cash, after all accruing expense of Receivership has been paid, *are the property of the Stockholders of record upon the date of the closing of*

*this Receivership, * * *"* (Emphasis supplied).

Upon receipt of the assets, the trustees were responsible to themselves only; they were not required to give bond or to make any accounting to the court, or to any other person than the stockholders; the court entertained no control over the trustees as to the manner in which they were to collect the assets; they brought such suits as they desired, at such times as their judgment indicated they should be brought.

The stockholders employed the liquidator, Penniston, to administer the trust. He continued in that position for some time and then turned over the remaining assets to trustee Richmond, an officer of plaintiff's bank, who continued to carry out the duties of the trustees in the matter of collection. Numerous suits were brought by the trustees throughout the period of liquidation.

I cannot agree with the contention of the plaintiff that the trustees were acting for the bank. It is my conclusion, in view of the undisputed facts, that upon the transfer of the remaining assets of the bank to the trustees and the dissolution of the corporation, the trustees took such assets as a liquidating dividend, and in full payment for the liquidation of their stock, and that the individual stockholders had no further claim against the corporation for any sum or sums which might be due to them by reason of their stock ownership in the bank. This contention of the plaintiff is therefore decided against it.

The next contention of the plaintiff is a more perplexing one—i. e., whether or not the assets received by the trustees to be administered for and on behalf of the stockholders had a determinable market value on January 11, 1936 at the time they were received by the trustees. If they did have a determinable market value at that time, it was the duty of the trustees, under the Internal Revenue Laws, to credit the respective stockholders with the value of such securities, and include in gross income such determinable market value as the assets had at that time, and to take credit for their loss during that year.

Regulation 111, Section 29.115-10 provides:

"If the whole or any part of the dividend is paid to a shareholder in any medium other than money, the property received other than money shall be included in gross income at its fair market value *at the time as of which it becomes income to the shareholder.*" (Emphasis supplied)

Section 29.111-1 provides:

"Computation of gain or loss.—Except as otherwise provided, the Internal Revenue Code regards as income or as loss sustained, the gain or loss realized from the conversion of property into cash, or from the exchange of property for other property differing materially either in kind or in extent. The amount realized from a sale or other disposition of property is the sum of any money received plus the fair market value of any property which is received. The fair market value of property is a question of fact, but only in rare and extraordinary cases will property be considered to have no fair market value. The general method of computing such gain or loss is prescribed by section 111, which contemplates that from the amount realized upon the sale or exchange there shall be withdrawn a sum sufficient to restore the adjusted basis prescribed by section 113(b) and sections 29.113(b) (1)-1 to 29.113(b) (3)-2, inclusive (i. e., the cost or other basis provided by section 113(a), adjusted for receipts, expenditures, losses, allowances, and other items chargeable against and applicable to such cost or other basis). The amount which remains after the adjusted basis has been restored to the taxpayer constitutes the realized gain. If the amount realized upon the sale or exchange is insufficient to restore to the taxpayer the adjusted basis of the property, a loss is sustained in the amount of the insufficiency. The basis may be different depending upon whether gain or loss is being computed.

"Even though property is not sold or otherwise disposed of, gain (includible in gross income under section 22(a) as 'gains or profits and income derived from any source whatever') is realized if the sum of all the amounts received which are required by

section 113(b) to be applied against the basis of the property exceeds such basis. On the other hand, a loss is not ordinarily sustained prior to the sale or other disposition of the property, for the reason that until such sale or other disposition occurs there remains the possibility that the taxpayer may recover or recoup the adjusted basis of the property. Until such identifiable event fixes the actual sustaining of a loss and the amount thereof the Internal Revenue Code takes no account of it. The provisions of this paragraph may be illustrated by the following example: * * *."

Whether the assets had a determinable market value at the time of their delivery, is a question of fact the court must determine under the evidence in this case. The assets consisted of 65 notes, ranging in amounts from $6.25 to $3735.00 signed by farmers; non-ledger assets of farmers composed of 19 notes ranging in amounts from $3.76 to $2852.50; some used office equipment and $2000.00 in cash. The cash item is not here to be considered.

■ There is little evidence here to assist the court in determining whether or not the assets had a determinable market value at the time they were taken over. The Government offers none, except what is alleged to be an admission by Richmond, one of the trustees, that the notes could have been sold. Richmond expresses the opinion that the notes had no determinable market value at that time—it is admitted that the notes had a "potential value." Richmond recites facts of which the court may take judicial notice—that hundreds of banks were in process of liquidation during that period. Throughout the farming area, which included Braddyville, Iowa, the casualties among banks were probably proportionately greater than in any other section of the country, because of the tremendous inflationary values upon which their assets and securities had been based in prior years.

■ The court may take judicial notice of the historical fact that prior to 1936, crop failures had been pretty general throughout this section of the country; that the farmers had for a number of years, been in the lowest economic state ever known to agriculture in the United States, within the memory of the generation, so, under such economic conditions, the court must determine whether notes given by farmers who had suffered from this unusual and unprecedented condition, had any determinable market value.

We may take into consideration the fact that it took the trustees and the liquidator, who had gone through the liquidation (at least some of whom were experienced bankers), exerting what we have a right to presume was every possible effort, a period of eight years to collect the sum of $13,646.76 out of a total of approximately $47,000.00.

■ In Mount v. Commissioner, 2 Cir., 48 F.2d 550, 552 after having discussed the question, "fair market value" is accorded the usual definition, i. e.,

"'* * * "Market value" is the price at which a seller willing to sell at a fair price and a buyer willing to buy at a fair price, both having reasonable knowledge of the facts, will trade. *Property received in exchange for other property has no "fair market value"* for the purpose of determining gain or loss resulting from such exchange when, owing to the condition of the market, there can be no reasonable expectation that the owner of the property, though wishing to sell and any person wishing to buy will agree upon a price at which to trade unless one or the other is under some peculiar compulsion.'" (Emphasis supplied)

The conditions under which the trustees received these assets in exchange for the Bank's stock, were not the conditions under which an exchange of property would ordinarily take place. Few people would be interested in buying assets of this type unless they could buy them at their own price, having in mind the long period, expense and problems, legal and otherwise, incident to their conversion into cash. As to the question of whether or not assets do have a market value within the meaning of the Income Tax Law, each case must be determined upon its own facts.

■ With that in mind, the court must take into consideration the character of the assets or property, the economic conditions,

and the question of whether or not there was any recognizable market for such property. Of course, one who accepts property in exchange for other property cannot put off the day of determining the value solely for the purpose of deriving the greatest amount of tax benefit. Nor, on the other hand, does it seem to me that it was the intention of the Congress, or of the regulations issued pursuant to the Act of Congress, that one receiving assets under such conditions as we have here should be required to sacrifice his property almost completely in order to receive such benefit. I find as a fact that the assets did not have a determinable market value at the time they were taken over by the trustees. The defendant contends that if such assets had any determinable market value any year subsequent to 1936 and prior to 1944, the plaintiff must have disposed of the assets and taken its loss.

The largest amount of collection by the trustees was the year 1936, and thereafter each year except two ('40–'42) some collections were made, but during all of that period, the trustees were actively attempting to make collections, suits were being filed and normal collection procedures were being followed. It is difficult for me to see how such assets, assuming they had no determinable market value in 1936, could have had any determinable market value at any time subsequent thereto, until the expectation of further collections could no longer be considered. Under such circumstances, men of experience with respect to such property should be accorded a reasonable amount of discretion in attempting to realize at least a fair amount from such property in an effort to reduce their loss.

In the opinion of the court, that principle should be applied to this case. I am unable to determine that such assets had a determinable market value at any time prior to 1944, when the further effort to convert such assets into cash was abandoned, and $11,267.04, approximately one-fourth of the total assets received by the trustees, were sold at public auction for $5.00.

It is my conclusion therefore, that the assets received by the trustees had no determinable market value when they were received in 1936, and no determinable market value at any particular period subsequent thereto, prior to 1944, and that the plaintiff was entitled to take credit in 1944 as a capital loss, the difference between $22,100.00 the cost of its stock, and the sum of $7,870.26 received by it as a result of the liquidation of the exchanged assets. It is so ordered.

The parties may submit judgment in accordance herewith.